**BRADLEY et al. v. HOWELL.**

No. 13945.

Court of Civil Appeals of Texas. Fort Worth.

March 3, 1939.

Rehearing Denied March 31, 1939.

A. H. Britain, of Wichita Falls, for appellants R. J. Bradley et ux.

Kilgore & Rogers, of Wichita Falls, and Hardwicke & Cheek, of Fort Worth, for appellants the Kadanes and J. E. Farrell.

Ben W. Tipton, of Electra, and T. R. Boone and Kearby Peery, both of Wichita Falls, for appellee.

BROWN, Justice.

The record is so voluminous and the briefs are so extensive and exhaustive that we felt the necessity of examining the entire transcript and all of the evidence found in the statement of facts. From these we conclude that the following is a fair statement of the facts leading up to, and the nature and result of the suit:

This is a suit predicated upon the primary right of specific performance brought in the District Court of Wichita County by J. H. Howell against R. J. Bradley and wife, Rado Bradley, Jack E. Kadane, Mike E. Kadane, Kadane, Inc., and J. E. Farrell as defendants. The suit arose out of the purported execution by R. J. Bradley of a written contract to execute and deliver an oil and gas lease to J. H. Howell covering 343 acres of the M. L. Gahagan Survey in Wichita County, which survey is a part of the K. M. A. Oil Field. The M. L. Gahagan Survey contains 503 acres of land. Subsequent to the execution of said purported contract, R. J. Bradley and his wife, and various other individuals who are tenants in common with the said R. J. Bradley in the ownership of the minerals in and under said Gahagan Survey, joined in the execution and delivery of an oil and gas lease on said 343 acres of land to Jack E. Kadane, as Lessee, which lease was subsequently assigned to Kadane, Inc. Thereafter Kadane, Inc., assigned said lease insofar as 93 acres of said land were concerned to J. E. Farrell, of Tarrant County.

550

The following facts are undisputed in the record:

J. H. Bradley, the ancestor of all of the Bradleys involved in this suit, including R. J. Bradley, in 1919, owned as his separate property (his wife having died many years before he acquired his interest) the 503-acre M. L. Gahagan Survey. He had six children, all of whom were still living at the time of the death of J. H. Bradley in 1921 or 1922.

In 1919 a warranty deed was drawn in which J. H. Bradley (the father) and all of his children, except R. J. Bradley, were named as grantors, which deed conveyed to the said R. J. Bradley, as grantee, the following land:

"427 acres of land in the M. L. Gahagan Survey, in Wichita County, Texas.

"It is further agreed and understood by the parties to this instrument that the grantors retain an undivided ½ interest in and to the oil and gas or other minerals in and under said tract of land, or a ½ interest in and to a ⅛th royalty of all oil, gas or other mineral that may hereafter be produced from said land by grantee."

This deed recited a consideration of $5,000 cash paid by R. J. Bradley and the further consideration that the said grantee, R. J. Bradley, should care for the support of his father, J. H. Bradley, for the remainder of his natural life. The deed was signed and acknowledged by all of the brothers and sisters of R. J. Bradley (they owning at that time no interest in the land), but it was not signed or acknowledged by J. H. Bradley, the father, who was named as one of the joint·grantors, and who actually owned the land.

Thereafter, in 1922, J. H. Bradley, the father and ancestor, died intestate, having never prior to his death either signed or acknowledged said deed.

· Thereafter, Jennie Dees, one of the daughters of J. H. Bradley, died intestate, leaving several children; and F. A. Bradley, a son, died, leaving a widow and six children, three of whom were still minors in 1937. All of the minerals in and under the 503-acre M. L. Gahagan Survey were, in 1937, owned in undivided portions by R. J. Bradley and by his various brothers and sisters, and nieces and nephews, their relations being that of tenants in common. The ownership of the surface of the land is not in controversy. For many years the land had been continuously used and oc-

cupied by R. J. Bradley and his wife, Rado Bradley, as their homestead.

R. J. Bradley, in 1937, was also the owner of the Simpson Holloway Survey, which lies immediately east of the Gahagan Survey. On or about, or shortly prior to, October 1, 1937, J. H. Howell approached R. J. Bradley with reference to the matter of securing an oil and gas lease on 80 acres of the Simpson Holloway Survey, and also with reference to securing an oil and gas lease on 343 acres of the Gahagan Survey. Bradley explained to Howell that, while he owned the Holloway Survey in fee, he was a tenant in common with various individuals, whom we shall call the Bradley heirs, as to the ownership of the minerals in the Gahagan Survey, and that Bradley had no authority to bind his tenants in common by the execution of an oil and gas lease on the Gahagan Survey.

. A parol understanding, apparently somewhat as follows, was reached on October 1, 1937, towit: R. J. Bradley and his wife, Rado Bradley, on that day executed and delivered to Howell an oil and gas lease covering 80 acres of land in the Simpson Holloway Survey, and, simultaneously with said delivery, Howell paid to Bradley the sum of $1600. Bradley would also send around to the various owners of undivided interests in the minerals in the Gahagan Survey, including the guardian of the minor heirs, an oil and gas lease covering 343 acres of the 503 acres in said survey. If the lease on the 343 acres of the Gahagan Survey was consummated by all of the tenants in common, including the guardian of the minor heirs, properly executing, acknowledging and delivering the same, Howell was to be entitled to a credit on the bonus consideration recited in said Gahagan lease of $800; that is, of the $1,600 cash paid to Bradley for the Holloway lease, $800 thereof should, in such event, be accepted . as a full bonus consideration for the Holloway lease, and $800 should be applied on the recited consideration for the Gahagan lease. It was likewise agreed by parol that, in the event all of the tenants in common who owned mineral interests in the Gahagan Survey did not consummate said lease or some of them refused to execute and deliver the same, Howell should pay to Bradley an additional $400 consideration for the Holloway lease, making a total consideration for said lease of $2,000.

As stated, the lease on the Holloway 80 acres was executed and delivered on October 1, 1937, Howell's attorney, Tipton, likewise on October 1, 1937, prepared an oil and gas lease covering 343 acres of the 503-acre Gahagan Survey in which all of the tenants in common, twenty-five in number, including the guardian of the minor heirs, were named as joint lessors, and J. H. Howell was named as lessee. Places were provided at the end of said lease for the signature of each of said twenty-five tenants in common. The lease so prepared recited a lump consideration of $3,430. It was for a term of three (3) years from date and as long thereafter as oil and gas were produced.

Up to this point no written memorandum of any kind was executed between Bradley and Howell. Bradley took the Gahagan Survey lease which had been prepared by Howell's attorney, a copy of same being retained by Howell. R. J. Bradley and his wife then signed and acknowledged the lease and proceeded to start it around to the various Bradley heirs with a letter of explanation. At the same time Bradley delivered to Howell's attorney, Tipton, the abstracts of title on the Gahagan Survey.

On October 16, 1937, Howell accidentally encountered Bradley in the town of Electra, Texas, and asked Bradley to go to Tipton's office for the purpose of executing an affidavit of expiration with reference to an oil and gas lease on the Holloway Survey. At that time, at Howell's suggestion, a written memorandum with reference to the Gahagan transaction was prepared by Tipton, Howell's attorney, which memorandum was as follows:

"Electra, Texas.
"October 16, 1937.
"Mr. Joe H. Howell,
"Electra, Texas.
"Dear Sir:

"This is to evidence my understanding with you as follows:

"On or about the 1st day of October, 1937, I joined by my wife, made, executed and delivered to you an oil and gas lease covering all of the S. Holloway Survey, Abstract No. 497, in Wichita County, Texas, save and except the south 180 acres, which 180 acre tract I had theretofore leased to you.

"As a consideration for the lease on the balance of the S. Holloway Survey, above referred to you paid me the sum of $1600.-00.

"On the same date above specified, to-wit: October 1, 1937, myself and wife also executed in your favor an oil and gas lease covering 343 acres out of the M. L. Gahagan survey in Wichita County, Texas, there being other parties interested with me in the Gahagan lease and it being necessary to obtain the signatures of the other interested parties which I am now in process of obtaining.

"It is my understanding with you that if the Gahagan lease above referred to is consummated by the other interested parties executing the same, including the Guardian of certain minor heirs, then and in that event $800.00 of the consideration paid to me for the lease on the balance of the S. Holloway Survey is to apply on the consideration for the 343 acres out of the Gahagan Survey. If the other interested parties in the Gahagan Survey fail, refuse and neglect to execute the lease and I am unsuccessful in obtaining this lease as planned, then and in that event the $1600.00 is to remain as the consideration for the balance of the Holloway Survey; and you are, in that event, to pay me, an additional sum of $5.00 per acre, or the sum of $400.00, as balance of the consideration for the lease covering the balance of the Holloway Survey as above specified.

"You will indicate your agreement to this understanding by signing an acceptance hereof.
"Yours very truly, R. J. Bradley.
"Accepted and agreed to:
"J. H. Howell."

On October 21, 1937, the lease on the 343 acres of the Gahagan Survey was received by Bradley duly signed and acknowledged by all of the tenants in common. On the morning of October 22, 1937, Bradley met Howell at the Kadane well in the K. M. A. Oil Field, at which time he told Howell that the Gahagan lease had been returned to him fully signed and acknowledged by all of the owners of the minerals. Thereupon, Howell suggested that he and Bradley meet at Tipton's office at 2:00 o'clock on the afternoon of October 22nd, to close the transaction, to which meeting Bradley agreed. At the appointed time on October 22nd, Bradley did go to Tipton's office in Electra, with the executed lease in his pocket and with the intention of delivering said lease to Howell on the payment of the additional consideration con-

tracted for, towit: $2,630. Howell had not been to Tipton's office when Bradley reached there. Later in the afternoon of October 22nd, Bradley came back to Tipton's office in an effort to meet Howell as agreed on. At that time he was told that Howell had 'phoned from Wichita Falls that he had been detained on business in Wichita Falls and would not be able to meet Bradley as planned.

Early in the afternoon of the next day, towit: October 23, 1937, Bradley went back to Tipton's office again with the lease in his possession, with the willingness to deliver the lease and accept the money therefor if Howell wanted to take the same. Howell was not there. Bradley at that time was told by Tipton's secretary that Howell had 'phoned the office to the effect that he was sick and would not be able to do anything until Monday, if then. Thereupon Bradley stated to Tipton's secretary in substance that he was not going to wait on Howell any longer and that the deal was off, and requested the return of his abstracts. The abstracts were delivered to him, and he left.

Prior to the afternoon of October 23rd, G. E. Kadane, an officer of Kadane, Inc., had encountered Bradley at the well which was being drilled by said company, south of the land in controversy. At that time he told Bradley that the lime had been struck high in said well, and the indications for an oil well were favorable. He inquired of Bradley whether or not there was any open acreage in the Gahagan Survey. Bradley told Kadane in substance that there was a tentative deal on whereby the land might be leased for $10 an acre. At that time Kadane told Bradley that, in the event the deal did not go through. he would probably be willing to pay more than that for a lease on the land. This was prior to the time Bradley went to Tipton's office on the afternoon of October 23rd to deliver the lease to Howell and get the money therefor.

After Howell failed to meet Bradley and pay for the lease on October 22nd and October 23rd, and after Bradley had been to Tipton's office on the 23rd and secured his abstracts, he went to Wichita Falls and saw Mary Ethel Bradley, one of the tenants in common who was also guardian of the three minor Bradley heirs. At that time he told her what had occurred with reference to Howell's failure on two different occasions to meet him and pay for

the lease, and also that he thought Kadane would pay more than $10 an acre for a lease on the land. Whereupon, Mary Ethel Bradley, acting for herself and as guardian of the minor heirs, instructed Bradley not to deliver the lease to Howell, withdrew her consent to its delivery, and requested Bradley to act for her in having the Probate Court in Dallam County, where the guardianship proceedings on the minors were pending, to rescind the order granting her permission to execute the lease to Howell.

Bradley then went to Kadane and told him the deal he had on the Gahagan tract was off; and a parol agreement was entered into whereby Kadane would pay $20 per acre for a lease on the land if it was consummated by all of the owners.

Bradley then had a new lease drawn up to Jack E. Kadane, in which all of the tenants in common were named as lessors, which lease was dated the 25th day of October, 1937, and was for a term of five (5) years from date and as long thereafter as oil and gas were produced.

On the afternoon of October 24, 1937, Bradley left and went to the Panhandle of Texas, and on the 25th of October, 1937, the Probate Court of Dallam County, on the application of Mary Ethel Bradley, as guardian of the estates of Randell Lee Bradley, Charles Ray Bradley and Aloice Maxine Bradley, minors, entered an order setting aside the former order of the Probate Court in which authority had been given for the execution of the lease to J. H. Howell, and reciting that Howell had refused to carry out his agreement with reference to the payment for the lease. Said order likewise authorized the execution of a lease to Jack E. Kadane.

On October 25th and 26th Bradley likewise conferred in person with several other of the Bradley heirs, and each of them withdrew their consent to the delivery of the Howell lease; and executed and acknowledged the lease to Jack E. Kadane. Thereafter, on or about October 26th or 27th, Bradley returned to his home, having mailed the Kadane lease to others of the Bradley heirs from the Panhandle, with a letter explaining what had transpired and what was proposed. The lease to Jack E. Kadane was finally returned to R. J. Bradley during the first few days of November, 1937, fully signed and acknowledged by all of the tenants in common, and on November 8, 1937, the fully executed lease was delivered to

Jack E. Kadane, and the consideration therefor was paid.

On October 25th, Howell executed an acknowledgment to the written memorandum of October 16th, heretofore quoted, and filed same for record in Wichita County. On or about October 28th, Howell went to Bradley and demanded delivery of the October 1st lease, which was refused. On October 30th, Howell filed an affidavit, attaching as an exhibit thereto the memorandum of October 16th and a copy of the oil and gas lease dated October 1, 1937, and setting up that the executed lease was in the possession of R. J. Bradley and that the said Bradley had refused to deliver the lease to him, and that he, Howell, had tendered performance to Bradley on or about the 28th day of October, and setting up that Howell claimed the right to said oil and gas lease. On November 5th, Howell instituted a suit against R. J. Bradley for specific performance or for damages.

On December 20th, 1937, Kadane, Inc., then the owner of the lease, executed an assignment of their oil and gas lease, insofar as 93 acres of said lease were concerned, to J. E. Farrell.

On January 29th, J. H. Howell filed an amended petition in which he named R. J. Bradley and his wife, Rado Bradley, Jack E. Kadane, Mike E. Kadane, Kadane, Inc., and J. E. Farrell as defendants. He pleaded the negotiations which Howell had had with Bradley with reference to the execution of an oil and gas lease on 343 acres of the Gahagan Survey, alleging that Bradley was acting as the agent for the rest of the owners; set up the preparation of the oil and gas lease on October 1, 1937, which was attached as an exhibit to the petition, and set up the execution of the written memorandum dated October 16, 1937, which was attached as an exhibit to the petition. Howell likewise pleaded the full and complete execution of the lease by all of the interested parties and the return of the same to R. J. Bradley, and that Bradley had authority to deliver the same on the payment of $2,630. Howell likewise pleaded that he and Bradley arranged for a meeting at the office of the attorney of Howell on the afternoon of October 22nd, for the purpose of the delivery of said lease and collecting the balance of said consideration, but that no such meeting took place, and that tentative arrangements were made between said parties to meet on the 23rd for the same purpose, but that prior thereto plain-

tiff was taken seriously ill and was unable to contact Bradley at the appointed time. Howell likewise pleaded that, at the time of the execution of the original lease, it was agreed that a complete abstract was to be delivered to Howell's attorney, Tipton, which was done, but that it was agreed that the examination of the abstracts should not be started until the lease, completely signed and acknowledged by all parties, had been returned. Howell likewise pleaded that Howell's attorney was familiar with the title to said property, had satisfied himself that the title was good and so informed plaintiff on or about October 23; that Bradley, in violation of his instructions and authority, had failed and refused to deliver the lease to Howell, although Howell was ready, willing and able at all times to pay therefor; and Howell made tender in his pleadings of the balance due and demanded the delivery of the lease.

As to the Kadanes, Howell pleaded that there was a conspiracy between Bradley and the Kadanes by which the lease of October 1, 1937, would not be delivered to Howell and another lease would be executed and delivered to the Kadanes, all for the purpose of depriving Howell of his right to receive said oil and gas lease; that the lease obtained by the Kadanes was not obtained until after Howell had instituted his suit and had filed in the Deed Records of Wichita County an affidavit which, together with the exhibits thereto, set up Howell's claims with reference to said lease, and that the Kadanes were not innocent purchasers of said lease, but were constructive trustees for Howell and held their lease for Howell; and plaintiff tendered to the Kadanes the purchase price paid by them for their lease.

As to the defendant, J. E. Farrell, plaintiff alleged that he had bought an assignment to his 93 acres with notice of Howell's rights, and that he was not an innocent purchaser, therefore, and that his rights were subordinate to Howell's rights.

In his first count, plaintiff prayed for specific performance and for a decree vesting him with full title to the original oil and gas lease dated October 1st, 1937.

In first count No. (A), plaintiff pleaded that the Kadanes were trustees for him and prayed that title to the lease standing in the name of the Kadanes be adjudged to be the property of Howell, and tendered to the Kadanes the consideration they had paid for said lease.

554

In his second count, plaintiff prayed for specific performance so as to entitle him to delivery of the full title to the lease of October 1, 1937, except as to any interest in said property owned by the three minor Bradley heirs.

In his third count, plaintiff, in the alternative, prayed for specific performance of said contract, insofar as the undivided interest of R. J. Bradley in said minerals was concerned, which he alleged to be a 7/12ths interest.

In his fourth count, plaintiff again prayed for specific performance and the delivery of the original lease, insofar as the individual interest of R. J. Bradley was concerned, whatever that interest might be.

In his fifth count, plaintiff prayed that, if he be mistaken as to his rights theretofore set out, he recover damages from defendant R. J. Bradley, for breach of his contract to deliver said lease in the sum of $68,600.

In this connection plaintiff likewise prayed that he recover damages against defendant, R. J. Bradley, on the basis of $200 per acre for each acre of said land which might not be decreed to him upon the other counts in his petition.

Defendant R. J. Bradley, in his answer:

(1) Filed an exception in abatement, setting up lack of necessary and indispensable parties.

(2) A general demurrer.

(3) Various special exceptions, setting up:

(a) Statute of Frauds;

(b) The insufficiency of the memoranda sued on to constitute a contract for the delivery of an oil and gas lease;

(c) The entire and indivisible character of said contract, if it constituted such;

(d) The unenforceability of said contract so far as the interests owned by the various tenants in common, including the guardian of the minor heirs, are concerned;

(e) That the various agreements, understandings, and the like which antedated the written memorandum of October 16th, and not contained in said memorandum, could not constitute a cause of action, and prayed that they be stricken.

By way of special answer, defendant, Bradley, named the various Bradley heirs, excluding R. J. Bradley, and pleaded that they were the owners of approximately an undivided 5/12ths interest of the minerals, the remaining undivided interest amounting to approximately 7/12ths being owned by defendant, R. J. Bradley and his wife. He denied that he ever executed any contract for the execution and delivery to plaintiff of any oil and gas lease on the land involved, either for himself or as agent for anybody else. He denied under oath that he was the agent for any of the Bradley heirs or that he undertook to execute said memorandum as their agent. He pleaded the circumstances surrounding the preparation of the original oil and gas lease and the preparation of the memorandum dated October 16, 1937, which memorandum he alleged was only intended as a statement as to the application of the money already paid to him by Howell.

He pleaded the breach of Howell's agreement to meet him and pay for said lease on October 22nd and October 23rd, setting up that time was of the essence of the contract, and that Howell had breached and wholly terminated said contract by his failure to meet Bradley and pay for the lease as he agreed to do.

Bradley likewise pleaded the Statute of Frauds. Vernon's Ann.Civ.St. art. 3995. He pleaded the withdrawal by his tenants in common of their consent to the delivery of the oil and gas lease to Howell, and execution of the subsequent lease to Jack E. Kadane. He alleged that 200 acres of the 343 acres involved had, since 1919, constituted the homestead of himself and his wife, as plaintiff, Howell, well knew prior to October 1, 1937, and that, if the written memorandum was sufficient to constitute a contract for the delivery of an oil and gas lease, it was an entire and indivisible contract for the execution and delivery of a full 7/8ths oil and gas lease on the entire 343 acres, and that same could not be enforced only as to his undivided interest in 143 acres of said land.

Defendant, Rado Bradley, filed a separate answer, adopting the answer of R. J. Bradley, and especially denying that she ever made or entered into any kind of contract with plaintiff for the execution and delivery of an oil and gas lease, and denying that R. J. Bradley was her agent in the execution of any such contract or lease.

Defendants, Jack E. Kadane, Mike E. Kadane, and Kadane, Inc., who will be referred to hereafter as the Kadanes, filed:

(1) A general demurrer.

(2) Special exceptions, setting up:

(a) The insufficiency of the written memoranda sued on to constitute a contract for the delivery of an oil and gas lease;

(b) Statute of Frauds;

(c) That the alleged written contract could not be binding on any other party at interest in the real estate in question;

(d) That the written contract showed that the subject matter within the contemplation of the parties was an oil and gas lease to be executed as an entirety by Bradley and his tenants in common, and that such written contract depended upon the will of strangers to it;

(e) That the written contract showed that any obligation on the part of R. J. Bradley was conditioned upon the continuing consent of the other tenants in common to deliver and execute an oil and gas lease, and, the petition negativing compliance with said condition, no cause of action was stated;

(f) That the blank form of oil and gas lease attached to said petition as an exhibit is not identified by any instrument in writing, can only be connected with the lease attached to the petition by parol evidence, and should be stricken;

(g) Excepting to all allegations to the effect that the Kadanes became trustees for plaintiff;

(h) Specially excepting to those portions of the petition seeking to enforce a partial performance of said memorandum for the reason that, if the contract was unenforceable as an entirety, it was not enforceable at all;

(i) Adopting all of the special exceptions of R. J. Bradley.

By way of special answer, after pleading a general denial, they denied that they entered into any kind of conspiracy with Bradley to induce him to repudiate any kind of contract he might have had with reference to the land involved, or that they knew plaintiff had a contract for the purchase of an oil and gas lease on said land or that they were guilty of any act which would make them a trustee for plaintiff. They pleaded the circumstances surrounding the delivery of the lease to them; pleaded the invalidity of Howell's alleged contract under the Statute of Frauds, and that, if the contract were otherwise enforceable, it was rendered unenforceable on account of the fact that Howell knew 200 acres of the 343 acres involved constituted the homestead of R. J. Bradley and his wife, because the contract was an executory contract for the sale of an interest in a homestead. The Kadanes also adopted all of the pleadings of their co-defendants where not inconsistent.

Defendant, J. E. Farrell, filed:

(1) A general demurrer.

(2) Adopted all of the special exceptions filed by defendants R. J. Bradley and the Kadanes.

(3) Pleaded a general denial and set up the following by way of special answer:

(a) That, if a contract was entered into between Howell and Bradley, the subject matter of same is not sufficiently identified by memorandum in writing, the same is unenforceable under the Statute of Frauds, which was pleaded in bar;

(b) That the written memorandum lacked mutuality both of obligation and of remedy;

(c) That said contract was an entire and indivisible contract for the delivery of a full 7/8ths oil and gas lease, and same is not enforceable as to an undivided interest in the minerals;

(d) That the contract showed on its face that it was a conditional contract, depending for its consummation on the consent and acts of third persons who were not parties thereto, showed on its face that Bradley did not agree to execute an oil and gas lease covering only his undivided interest; and, since it affirmatively appears, from plaintiff's pleadings, that the owners of the remaining undivided interests did not join in the execution and delivery of said oil and gas lease to plaintiff, the condition on which Bradley was to be bound did not happen, and same should not be enforced as to his undivided interest only.

(e) That 200 acres of the 343 acres involved was to plaintiff's knowledge the homestead of R. J. Bradley and his wife; that said contract was and is entire and indivisible, and same cannot be enforced only as to the undivided interest of Bradley in the non-homestead land.

Farrell further pleaded that the land involved was in a newly discovered oil field where values were fluctuating, that time was of the essence of the contract, and it was the duty and agreement of Howell to pay the consideration for said lease as soon as it was received by Bradley; that Howell committed a material breach of his contract when he failed to meet Bradley on October 22nd and pay for the lease, and he likewise

committed a material breach of his contract when he failed and refused to meet Bradley on October 23rd, and that said contract was, therefore, breached by plaintiff, Howell, by virtue of his said failures, and Bradley was entitled to declare said contract, if any, at an end and terminated. Farrell further pleaded that he paid a valuable consideration, towit: $125 per acre, for the 93 acres assigned to him; that he was a bona fide purchaser for valuable consideration without notice of Howell's alleged contract. He further pleaded that he had no notice of any facts which would cause defendants, the Kadanes, to stand in the capacity of trustee to J. H. Howell, and had no notice, actual or constructive, of said trust relationship.

Plaintiff, Howell, filed supplemental petitions, setting up that time was not of the essence of the contract, and that, if it was, he offered to comply therewith within a reasonable time as provided in said contract, and further that defendant, Bradley, waived Howell's failure to meet him on October 22nd in that he acquiesced therein and agreed to meet Howell on the following day, towit: October 23, 1937, at which time Howell would have met Bradley and consummated the deal but for his serious illness.

The court overruled the various exceptions filed by the various defendants. The evidence was heard, at the conclusion of which all defendants filed a request for a peremptory instruction, which was by the court denied. Thereupon the case was submitted to the jury on special issues.

The jury found that:

(1) Bradley and Howell agreed if the lease on the Gahagan land was returned to Bradley duly signed and acknowledged by all the owners, same was to be delivered to Howell upon the payment of $2,630;

(2) It was agreed between Howell and Bradley that Howell was not to pay for the lease until his attorney had examined the title;

(3) It was their agreement that title was not to be examined until the lease was returned duly signed by the owners;

(4) Bradley did not wait a reasonable length of time after the lease had been returned duly signed for Howell to have the title papers examined;

(5) It was mutually agreed that Tipton would be notified when the lease had been returned duly signed;

(6) Howell, at all times since the lease was returned duly signed, has been ready, willing and able to pay for said oil and gas lease;

(7) Howell told Bradley, after the lease was returned duly signed, that he was unconditionally ready to pay for said lease on October 22nd and October 27, 1937;

(9) The offer of Howell to pay Bradley for said lease was within a reasonable time after said lease had been returned duly signed;

(10) Howell acted as an ordinarily prudent person in attempting to obtain delivery of the lease;

(11) Bradley failed to use good faith in refusing to consummate the deal with Howell;

(12) The Kadanes offered Bradley more than $10.00 per acre for said lease;

(13) Defendants made said offer before Bradley went to Tipton's office on October 23, 1937;

(14) The Kadanes knew that Howell had a contract for said oil and gas lease;

(15) The Kadanes had notice of Howell's rights in the leasehold estate before they consummated their purchase;

(16) The Kadanes knew prior to the time they paid for their lease that all of the owners had signed a similar lease to Howell;

(17) The Kadanes did not offer to pay Bradley a larger sum of money for the lease for the purpose of inducing Bradley and his tenants in common to refuse to make delivery to plaintiff, Howell;

(18) The larger offer induced Bradley not to deliver the lease to Howell;

(19) The Kadanes knew when they made their offer to Howell that Bradley had authority to act for the other owners of the land in connection with delivery of the lease to Howell;

(20) Bradley would have delivered said lease to Howell if the Kadanes had not offered a larger sum of money therefor;

(21) The larger offer by the Kadanes was the proximate cause of Bradley's failure to deliver the lease to Howell;

(22) Bradley did not acquiesce in the failure of Howell to meet him on October 22, 1937;

(23) Howell was not physically able to meet Bradley in Tipton's office on October 23, 1937;

(24) The inability of Howell to meet Bradley on October 23, 1937, was on account of sudden serious illness;

(25) Farrell had notice of Howell's rights in the Gahagan lease prior to the time Farrell purchased his interest;

(26) There was no understanding between Howell and Bradley that the lease was to be delivered in the event there was no change in the situation with respect to the value of said lease when it was returned fully signed;

(27) By the execution of the letter of October 16, 1937, it was agreed between Bradley and Howell that the original verbal agreement, if any, was the same as it had been before;

(28) Bradley did not have the right to refuse to deliver the lease to Howell in the event the Kadane well showed evidence of producing oil prior to such delivery;

(29) When the Kadanes agreed to buy their lease they did not do so in good faith, believing that all prior negotiations between Bradley and any other person involving said property had been terminated;

(30) Bradley would have delivered the lease to Howell if Howell had paid the agreed price for it on October 23rd, at Tipton's office.

After the jury's verdict, plaintiff filed motion for judgment. Defendants, Kadanes and Farrell, filed motion for judgment non obstante veredicto, and R. J. Bradley and Rado Bradley filed motions for judgment non obstante veredicto. On August 26, 1938, the court entered judgment decreeing:

(1) That plaintiff do have and recover of and from the defendants, Kadane, Farrell, Bradley and wife, the title and possession to 7/12ths of the leasehold estate covered by the lease dated October 25, 1937, from R. J. Bradley and others to Jack E. Kadane, save and except 200 acres thereof, described in the judgment, which the court found was the homestead of R. J. Bradley and wife, and vesting the title to 7/12ths interest in and to said oil and gas leasehold estate in Howell and out of said defendants;

(2) That the judgment should be effective only if and when Howell paid to the defendants, the Kadanes and Farrell, the sum of $1,638.35;

(3) That Howell recover from R. J. Bradley the sum of $1,634.17.

By this judgment Howell was vested with a 7/12th interest to 143 acres of an oil and gas lease to Jack E. Kadane, dated October 25, 1937, and having a primary term of 5 years, although the oil and gas lease in which Howell was named lessee and to which he was alleged to be entitled was dated October 1, 1937, and had a primary term of but 3 years.

All parties excepted to the judgment of the court.

Thereafter defendants R. J. Bradley, defendant Rado Bradley, and defendants the Kadanes and Farrell seasonably filed motions for new trial which were by the court overruled, to which action and ruling of the Court each of said defendants excepted and gave notice of appeal to the Court of Civil Appeals for the Second Supreme Judicial District. Supersedeas bond was fixed by the court for the defendants Kadanes and Farrell in the sum of $12,000, which bond was duly filed and approved. Appeal bond was duly executed and filed by the defendant, R. J. Bradley and Rado Bradley, which bond was duly approved.

We gather from appellee's brief that his contention is, that he is in no position to obtain a decree for specific performance of the contract upon which he relies, obviously, because Bradley, and others who are interested, have conveyed the interest, which he contracted to purchase, to third persons who were not parties to his contract, but that, by reason of the facts alleged by him, he is entitled to a decree adjudging these subsequent purchasers to be trustees who hold the estate in trust for him.

■ In the beginning, we desire to say that it must follow, as a matter of course, that, unless appellee Howell can stand upon a contract of which he could have exacted specific performance, in the courts of Texas, he cannot obtain a decree holding that the persons, who have acquired the title from the party, or parties, with whom he contracted, are now holding the title as trustees for his use and benefit. Saulsbury v. Anderson, Tex.Civ.App., 39 S.W.2d 142, writ dismissed.

We shall discuss what we consider the high lights in this controversy. To discuss at length every issue raised would lengthen an opinion that is, of necessity, too long.

We believe that the defendants below were entitled to a peremptory instruction.

It is obvious that Howell must stand, or fall, on the memorandum dated October

16, 1937, signed by R. J. Bradley and by Howell, and the proposed oil and gas lease, reduced to writing theretofore, signed by R. J. Bradley and his wife, and which could not become a binding contract until all interested and necessary parties thereto signed and delivered the same to Howell, as lessee, upon his paying the purchase price thereof.

Howell could not enforce any rights arising out of an oral contract to make any such lease. He was confronted with the Statute of Frauds.

Howell, in his pleadings, attempts to stand on such memorandum and the lease to which it refers. Bradley made no effort to sign such memorandum agreement as agent for the many other joint tenants. The memorandum discloses that he had no such authority, and assumed to exercise no such authority, and it is undisputed, in fact admitted by Howell, that he knew that Bradley had no such authority.

It cannot be contended that Bradley had been authorized as the agent of the other joint tenants to make even a tentative contract with Howell. From this record, it appears that Bradley merely undertook to obtain from all of the joint tenants a joint oil and gas lease, making Howell the lessee.

It follows that, there being no contract binding the other joint tenants to execute the lease in favor of Howell, and none of them being obligated to do so, any one, or all of them, could both forbid and prevent the delivery of the lease by Bradley to Howell, even after they, or any of them, had signed and duly acknowledged the same.

It follows that any one, or all of them, could so prevent and forbid such delivery without giving or having any reason for such action, or because of some reason either disclosed or undisclosed. This is manifestly true because there was not the semblance of a contract between Howell and the many other joint tenants, who did not sign, and who did not authorize R. J. Bradley to sign, the written memorandum on which Howell must stand.

It is undisputed that several of these joint tenants instructed R. J. Bradley not to deliver the lease to Howell, after Howell failed to meet R. J. Bradley in Howell's attorney's office, as he had theretofore agreed to do, and had failed to pay Bradley the purchase price of the lease.

One of these joint tenants was a sister-in-law of R. J. Bradley, who was likewise guardian of her minor children—such children being heirs of their deceased father, and joint tenants by reason of such inheritance.

Another of these joint tenants, who refused to permit the delivery of the lease by R. J. Bradley to Howell, was Mrs. Rado Bradley, wife of R. J. Bradley, who had a vested homestead right in and to 200 acres out of the 343-acre tract involved here. All of which vested right was well known to Howell.

It is not necessary to call attention to the other joint tenants who instructed R. J. Bradley not to deliver the lease to Howell.

It will be noted that the trial court fully recognized the principle we here announce. The trial court made no effort to adjudge to Howell any right, or interest, that might flow from or grow out of the interest of any of the joint tenants, except such fractional right, title and interest as the court concluded R. J. Bradley had in 143 acres —being the remaining portion of the tract, after deducting the homestead interest of 200 acres.

The sister-in-law, Mrs. Mary Ethel Bradley, in her own right and as guardian of her said minor children's interests, not only withdrew her consent to the delivery of the lease, on October 23, 1937, but she secured from the Probate Court of Dallam County, in which the guardianship was pending, a decree and order, on October 25th, 1937, rescinding the order theretofore made by such court authorizing her, as guardian, to execute and deliver the lease to Howell. This was before Howell claims that he offered to take and pay for the lease.

This guardian not being bound, by any character of contract, to execute and deliver the lease to Howell, could, as we have said above, refuse to deliver or to consent to the delivery of the lease while yet in the hands of R. J. Bradley, without giving, or even having a reason for so doing. But we find that she had a good and substantial reason for declining to permit the lease to be delivered. Because of Howell's delay in closing up the trade, he having failed to meet R. J. Bradley, as he agreed to do, for the purpose of closing the deal, this guardian was of the opinion that she could obtain more for the lease

than the amount Howell offered to pay, if he finally took the lease.

■ Because she was not legally bound to convey to Howell, it was her duty to obtain the best price possible, acting in the interest of her wards.

Article 4165, Vernon's Ann.Civ.St., specifically stipulates that: "It is the duty of the guardian of the estate to take care of and manage such estate as a prudent man would manage his own property."

Who would contend that a prudent man, under no legal obligation to execute and deliver an oil and gas lease to one who says he will pay $10 per acre for the lease, if he takes it, would not execute and deliver a lease to some other person who offers and pays twice as much?

So we find the guardian acting, within her lawful rights, for herself and for her wards prior to any offer of Howell to close the deal.

Coming now to the rights of Mrs. Rado Bradley—wife of R. J. Bradley—as measured by her homestead interest in 200 acres of the 343 acres in controversy, of which right Howell was cognizant, and so testified.

In the case of Saulsbury v. Anderson, supra, the wife refused to sign the deed and the Court said [39 S.W.2d 147]: "Further, the plaintiff having entered into a contract with Anderson with full knowledge that the homestead of Anderson and wife was located upon the land described in the contract, he was not entitled to penalize the husband and thereby force the wife to sign the deed conveying the land to him, including the homestead, when the plaintiff was charged not only with the knowledge of the facts as to the homestead, but also with knowledge that under the Constitution and laws of the state of Texas, he could not compel the wife to convey her homestead. *This is true even if she had signed the contract, for she could repudiate the transaction up to the very time of the delivery of the deed from her and her* husband. [Italics ours.] Knowing that he was not entitled, under the law, to compel the conveyance of the homestead as against her, plaintiff entered into an unenforceable contract. In the attempt, therefore, to enforce specific performance, plaintiff was at fault in the making of the contract, which not only defeated him in having the court to perform for him, but also deprived him of any right to recover damages."

Law of Marital Rights in Texas (Speer) par. 474, page 573 et sequiter; same text par. 477, pages 579, 580. As applied to an oil and gas lease covering the homestead see Maynard v. Gilliam, Tex.Civ.App., 225 S.W. 818; Burnett v. Mitchell et ux., Tex.Civ.App., 158 S.W. 800, writ refused.

Since R. J. Bradley, being in possession of the oil and gas lease, had not made delivery of such instrument to Howell and had not received from Howell the proposed purchase price, he was vested with no authority and had no power vested in him whereby he could make delivery to Howell of the lease over the objection of any of the joint tenants, who were not parties to the written memorandum, on which Howell bottoms his suit.

■ Bradley had no authority to make any such contract for his joint tenants; Howell had no contract with the joint tenants; and the courts of Texas will not make a contract for them.

■ In this discussion we have treated the contract, or written memorandum, on which Howell stands, as a binding contract, so far as it goes. We are inclined to the opinion that it is nothing more than an option, and that Howell could have refused to take the lease on the Gahagan tract had he so chose. The owners of the Gahagan tract, who were not parties to this memorandum dated October 16, 1937, could not require Howell to perform and it follows that he could not require them to perform.

■ Under the principle announced by Mr. Justice Dunklin in the case of Watson et al. v. Cloud et al., Tex.Civ.App., 225 S.W. 807, 808, R. J. Bradley cannot be personally held in view of the fact that some of his joint tenants refused to agree to the delivery of the lease and the acceptance of the proposed purchase price.

Mr. Justice Dunklin, speaking for this court, said: "It [the oil and gas lease] did not purport to be a divisible contract by the terms of which the lessee would acquire a lease upon the undivided interest of such lessors as might execute the instrument in the event the other owners of the land did not execute it. For that reason, the lessee could have refused to be bound by the instrument after the other heirs refused to execute it."

The instant case presents a stronger reason for the rule so invoked. The memo-

randum, on which Howell stands, shows upon its face that the proposed lease would never become a binding contract upon any of the owners of the land unless and until all executed and delivered the lease to Howell. 58 Corpus Juris, p. 884, par. 40, citing Armstrong v. James, Tex. Civ.App., 220 S.W. 420. See, also, Allen v. Friedman, Tex.Civ.App., 256 S.W. 669, writ dismissed. Other jurisdictions are in harmony with the Texas courts, as is shown by the following: Obermark v. Clark, 216 Ala. 564, 114 So. 135, 55 A.L.R. 1153; Affrime et al. v. Mandel et al., 267 Pa. 387, 111 A. 255; Brown v. Power, 263 Pa. 287, 106 A. 539; Olson v. Lovell, 91 Cal. 506, 27 P. 765; Thompson v. Musick, 85 Kan. 399, 116 P. 612; Stout v. Porritt, 250 Mich. 13, 229 N.W. 409.

A very interesting case in which an application for a writ of error was dismissed by the Supreme Court is that of Patten v. Pinkston et al., Tex.Civ.App., 51 S.W.2d 1068, 1069. Mr. Chief Justice Willson, speaking for the court, said, with reference to a situation practically identical with the case at bar:

"It is plain, we think, that appellant was not entitled to any relief as against Mrs. Pinkston, for it was not pretended in the evidence that she ever entered into any kind of a contract with him. It is also plain, we think, that appellant was not entitled to the relief he prayed for as against the Warner-Quinlan Company, unless he had a contract enforceable against the Pinkstons leasing the land to him before they leased same to said company. As just stated above, appellant never had a contract of any kind with Mrs. Pinkston, and we have found nothing in the record showing a right in him to have her contract with the Warner-Quinlan Company canceled.

"It follows from what has been said that we think appellant is not entitled to complain of the judgment so far as it was in favor of the appellees other than E. L. Pinkston. And we think he also is not entitled to complain of the judgment in that respect. The lease in question was as much the contract of Mrs. Pinkston as it was the contract of her husband, and we think it was not error for the court to refuse to require him to deliver her contract to appellant.

"The parties seem to have treated the transaction between them as one in which, to be effective, it was necessary for Mrs. Pinkston to join, and we have found nothing in the record indicating to the contrary."

The trial court erred in an attempt to enforce the memorandum agreement as against R. J. Bradley's fractional interest in 143 acres of the 343-acre tract.

There is nothing in the record indicating that R. J. Bradley intended to bind himself as to his undivided interest in and to the lands in controversy, or any part thereof. The entire record is bristling with facts repugnant to any such contention.

Furthermore, Howell raised no such issue and makes no such contention in his pleading.

R. J. Bradley could not have compelled Howell to accept from him a lease covering an undivided 7/12 interest in 143 acres of land, and it must follow that Howell cannot compel Bradley to make any such lease to him.

No contract was ever entered into by the parties from which any such deduction can be made. The trial court has attempted to make a contract for the parties which was never contemplated between them. This the trial court could not do.

The memorandum and the lease to which it refers contemplate an entire and indivisible contract. 58 Corpus Juris, pp. 899–904; Watson v. Cloud, Tex.Civ.App., 225 S.W. 807; Cheney et al. v. Coffey et al., Tex.Com.App., 113 S.W.2d 162; Texas Auto Co. et al. v. Arbetter et al., Tex.Civ. App., 1 S.W.2d 334, writ dismissed; Burnett v. Mitchell, Tex.Civ.App., 158 S.W. 800, writ refused; Venator v. Swenson, 100 Iowa 295, 69 N.W. 522; Horseth v. Fuglesteen, 165 Minn. 38, 205 N.W. 607; Goodwin v. Stuart, 125 Tex. 212, 82 S.W. 2d 632; Clegg v. Brannan, 111 Tex. 367, 234 S.W. 1076.

We are committed to the proposition that Howell must stand, or fall, with his written memorandum and the proposed lease referred to therein.

Indeed, Howell undertakes to do so in his pleadings. Nowhere does he allege any ambiguity, any fraud in the preparation of the writings, any accident or mutual mistake in the preparation or the making thereof.

The writings are plain, easily understood and need no explanation.

■ Whatever was said, or agreed to orally, between R. J. Bradley and Howell,

if it cannot be found within the four corners of the writing cannot be relied upon by Howell to explain, change or add to the agreement that was finally reduced to writing.

From the record it seems that Bradley was perfectly willing for whatever agreement he had made with Howell to remain unwritten, but it was Howell who was insisting upon the matter being reduced to writing. To carry out such purpose Howell had his lawyer prepare the instrument on which Howell depends for a recovery here, and after Bradley signed it Howell accepted it.

Howell and his attorney had had possession of the abstract of title covering the land in question for 16 days, when Howell requested that the agreement and "understanding" be reduced to writing. Howell had been in the oil business for many years and he knew that he could never enforce an oral contract to execute and deliver to him an oil lease.

The duty devolved upon him to incorporate all of the essential elements of the agreement in the written contract.

 If he wanted to have a given number of days within which to have the title examined, after the lease was signed and acknowledged by all the lessors, and before he was obligated to pay for the lease, or if he desired a given number of days, after the lease was so signed, within which to close the trade, he should have so stipulated in the memorandum. But he did no such thing, and he cannot be heard to say that he declined to take and pay for the lease because his attorney had not examined the title thereto and that he had an agreement with R. J. Bradley that he was not to take the lease until the title was examined and approved by his attorney, after the lease came back duly signed by all parties.

 Time is of the essence of such a contract as the one before us. Mayhap the time that Howell desired, or needed, would not have met with the approval of R. J. Bradley.

It is certain that Howell had no contract, with Bradley's joint tenants, covering his right to take any time either for the examination of the abstract of title or within which to close the deal, after the lease was ready for delivery.

It is undisputed that Howell agreed to meet R. J. Bradley in the office of Howell's attorney on the 22nd day of October for the purpose of closing the deal. This Howell did not do, but said he would be there on the 23rd of October, and on such last named day Howell telephoned that he could not meet Bradley because he (Howell) was sick and could not meet Bradley before Monday (the 25th) and perhaps not even then.

Under these circumstances, Bradley picked up the abstract, called the deal off and walked out of Howell's attorney's office.

Howell was well enough, on the morning of Monday, October 25, 1937, to have prepared and executed an acknowledgment on his part of the written memorandum, on which he relies, and same was filed for record in the office of the County Clerk of Wichita County at 10 A. M. of the same day.

The jury found that Howell told R. J. Bradley on October 22nd, 1937, that he was *unconditionally ready to pay for the lease*. This was after Howell knew that the lease had been signed by all of the necessary parties and was then in Bradley's pocket, and it was then that Howell agreed to meet Bradley, as aforementioned, but neglected to do so on the theory that he got back to town too late, and at that time agreed to meet Bradley the next day.

We do not think Howell can be heard to say that he did not meet Bradley and close the trade because his lawyer had not examined the abstract of title.

The jury further found that Bradley did not acquiesce in the failure of Howell to meet him, as agreed upon, on October 22nd.

The theory of Howell's case is that Bradley having gone back to the meeting place on the 23rd of October thereby acquiesced in Howell's failure to live up to his promise to meet Bradley on the 22nd.

Howell pleaded that his attorney had examined the abstract of title and had informed Howell "that the title was good * * * on or about October 23rd, 1937."

Howell testifies that he was sick and confined to his home on October 23rd and physically unable to meet Bradley and close the deal.

If he was able to take an opinion from his lawyer and to use the telephone during that day he was amply able to close the deal with Bradley, and all he needed do

was to have advised Bradley to come to his home and close the deal.

We are convinced by this record that Howell did not fail to close the deal because the abstract of title had not been examined by his attorney.

Time was of the very essence of the contract in controversy.

Here was an important "wildcat" well being drilled on a tract near the lands in controversy. Values were changing and apt to change rapidly at any time. If the well were condemned, the proposed lease would be valueless; if the well were a producer, the lease would increase in value in keeping with the size of the well.

 Howell had been down to the "wildcat" well to get what information was available and there saw Bradley, and agreed to meet him, as above stated, at Howell's attorney's office that very afternoon, for the purpose of closing the deal. Why Howell did not meet Bradley, as he agreed to do, is not made entirely clear; and what Howell was doing between the time he agreed to the meeting and the close of the day is not disclosed, and we are not given the privilege of entering into the realm of speculation in connection therewith. The fact that Howell was ill provides no excuse for his failure to meet Bradley at the appointed time and close the trade. 10 Tex.Jur. 438; Brotherhood of Ry. Trainmen v. Dee, 101 Tex. 597, 111 S.W. 396; and T. G. Shaw Oil Corp. v. Parker, Tex.Civ.App., 61 S.W.2d 587, and authorities cited, by Mr. Justice Dunklin.

This opinion is altogether too lengthy and we pretermit passing upon the remaining propositions and assignments of error. We content ourselves with saying that in our opinion there are several errors in the record which would require a reversal and remand, if we were not convinced that the judgment should be reversed and here rendered for appellants.

For the reasons given, the judgment of the trial court in favor of appellee Howell against each and all of the appellants, is reversed and judgment is here rendered that Howell take nothing against said appellants, or any of them; and the judgment requiring appellee Howell to pay appellants, Kadanes and Farrell, $1,638.35 is reversed and here rendered that said appellants recover no money judgment against appellee, Howell; and on the cross-action of R. J. Bradley against Howell, judgment is here rendered for appellant, R. J. Bradley, against said Howell, in the sum of $400, being the balance due R. J. Bradley by Howell on the above mentioned 80-acre tract and lease covering same. All of which is this day ordered.

### On Motion for Rehearing.

The two outstanding reasons that furnish insurmountable barriers to any recovery by Howell, as discussed in our original opinion, are:

(1) That there never was a contract between Howell and the persons who are joint owners, with R. J. Bradley, in the Gahagen Survey lands. Being under no contractual duty to give Howell a lease on these lands, any one of them could forbid and prevent the delivery of the lease, before it was actually delivered and the proposed purchase price paid. This, some of them did. Their reasons for so doing may not be inquired into or questioned.

(2) The written memorandum, on which Howell must stand or fall, shows upon its face that the lease was not to be binding upon any person unless and until all interested parties agreed to the execution and delivery of the lease to Howell.

Therefore, when the lease was not delivered to Howell by the other Bradley heirs, he could not hold R. J. Bradley on the theory that R. J. Bradley contracted to deliver his interest in or portion of such lands to Howell, at all events.

We are of opinion that we properly disposed of this cause in our original opinion, but we here give reasons why, in our opinion, the judgment of the trial court should, in all events, be reversed and remanded, if it is held that we are in error in rendering judgment, as was done; and we here give additional reasons and authorities which we believe support our first conclusions.

 (1) We do not believe that the evidence brought forward by Howell to show that he was ready, able and willing to take and pay for the lease is sufficient to raise the issue. Howell's statement that he was so circumstanced, had it stood alone and in such simple and straight forward language, without objection, would have raised the issue—in our opinion—even though the testimony comes from a vitally interested party; but when Howell undertook to tell where and in what form the funds he depended upon were, he was so uncertain, so indefinite

and his recollection was so poor that he was unable to give any details, or to show any substantially accurate knowledge of what he had or where he had it. He declined to say and rested his case on not remembering and refusing to attempt to give any facts. Of this we are quite certain: The finding of the jury on the issue of whether or not Howell was ready, able and willing to pay for the lease is without sufficient support in the evidence, and the answer is not supported by a preponderance of the evidence. 66 Corpus Juris, p. 1553, par. 1657; Matthews v. Deason, Tex.Civ.App., 233 S.W. 330.

In Jones on Evidence, 2nd Edition, Sect. 90, we find the following wholesome statement: "It is generally recognized that, where a party relies on a weaker species of evidence than it is within his power to produce, the basis for an adverse inference is furnished."

(2) In connection with this issue, we find that the trial court submitted the matters to the jury in one issue, requiring the jury to find whether or not "Howell has been ready, willing and able to pay for said oil and gas lease at all times since same was returned to R. J. Bradley," etc.

Objection was made to the issue because it is multifarious—duplicitous—and the objection was overruled by the trial court. Exception was taken to the ruling.

The Beaumont Court of Civil Appeals in Granata v. Mothner, 44 S.W.2d 817, condemned a charge in like terms.

We think the holding sound. It is one thing for a proposed purchaser to be willing to go through with a trade, it is altogether another thing for him to be able to do so, and yet another thing for him to be ready to do so.

He might be able to pay the purchase price and not be ready to close the deal. He might be willing to close the deal and not be able to pay the purchase price.

"Ready" means "prepared for immediate movement or action". It is easy to see that one may be able and willing to close a deal, and yet not be prepared for immediate movement or action.

(3) The trial court, over proper objections made by the defendants, submitted an issue requiring the jury to find whether or not Howell was physically unable to meet Bradley in Howell's attorney's office on October 23rd, and a second issue, whether or not Howell's inability to so meet Bradley was occasioned by sudden illness.

Vol. 10, Tex.Juris., p. 438, par. 253, lays down the rule that is general, viz.: "Illness of a party will not excuse performance in the absence of a provision to that effect in the contract."

No one knew better than Howell the bodily ailment to which he was heir. Knowing this, he could have provided in his contract for such contingency, but this he did not do.

We see no distinction in principle in Howell's situation with respect to his heart trouble, and the situations dealt with in the case of T. G. Shaw Oil Corp. v. Parker, Tex.Civ.App., 61 S.W.2d 587, opinion by Mr. Justice Dunklin, and Brotherhood of Ry. Trainmen v. Dee, 101 Tex. 597, 111 S.W. 396. Howell was able to use the telephone during his illness and he could have delegated the authority to close the deal to his attorney, or to any other person.

We think it was error to give these charges, in the light of the record before us.

(4) It will be observed that the proposed lease in which Howell was interested shows date of October 1, 1937, and is for a primary term of three (3) years, while the lease to the Kadanes is dated October 25, 1937, and is for a primary term of five (5) years, and the trial court has attempted to vest in Howell an interest in the last mentioned lease.

By the terms of the proposed lease, Howell could defer the drilling of a well on the leased lands for only three years, upon payment of the stipulated rentals, while under the terms of the Kadane lease, the drilling may be postponed for a period of five years. This is a distinct advantage to the lessee.

We do not believe the court is authorized to make for the parties another and different contract from that which the parties contemplated making. 38 Tex.Jur., p. 796, par. 103, and cases cited.

The judgment of the trial court is erroneous in the respect mentioned.

(5) The judgment of the trial court does not attempt to vest in Howell a complete leasehold interest in and to 7/8ths of the oil and gas produced from the 143 acres with which the trial court deals, but vests in Howell 7/12ths of such

7/8ths of the oil and gas, on the theory that R. J. Bradley is the owner in fee of such 7/12ths interest.

The many other joint tenants were not parties and were not made parties to the instant suit, and we hold that the trial court could not render a decree, in effect, adjudicating such interests, in the absence of these necessary parties.

The question of a proper division of the mineral rights must be settled by all parties in a proper manner among themselves, or the court must settle these rights when all interested parties are before the court.

We do not believe that the trial court could, in any event, render such a judgment as was rendered against R. J. Bradley, in which only partial performance of a contract is decreed, but if the trial court had any such authority, no decree, fixing the fractional interest of R. J. Bradley, could be entered, in the absence of the other necessary parties.

Without going into details we hold that R. J. Bradley's interest is one that must be determined, and that the record in this case does not establish as a matter of law that he owns an undivided 7/12ths interest in the minerals in and under the 143 acres involved.

■ (6) We believe it was error to permit the introduction of testimony to the effect that it was agreed between Howell and R. J. Bradley that Howell was not to pay for the lease until Howell's attorney had examined the abstract of title thereon, and that the abstract was not to be examined until the lease was returned, duly signed by all of the owners; and we believe that it was error to submit issues touching on these questions.

The joint tenants, who had nothing to do with, and who were not bound by such agreement as may have been made by R. J. Bradley, could not be bound by any oral and undisclosed agreement on which Howell seeks to rely, and the contract, as we view it, being indivisible, we think the evidence touching on R. J. Bradley's oral agreement with Howell should not have been admitted and the special issues predicated thereupon should not have been given.

■ (7) In conformity with the rule laid down in Vol. 65, Corpus Juris, p. 1020, par. 950, to the effect that a trust will be established and enforced by a conveyance of the property as against the trustee or a purchaser from him, only on condition that the person seeking the relief pay, tender, offer to pay, or give security or indemnity for, the purchase price paid by the defendant for the trust property, Howell pleaded that the Kadanes held the lands in trust for him and offered to pay the Kadanes the sum paid by them for the lease; but Howell did not plead that Farrell held the 93 acres conveyed by the Kadanes to Farrell, in trust for him, and he did not offer to pay Farrell the sum of $125 per acre, the price paid for the lease by Farrell to the Kadanes.

Therefore the judgment against Farrell is without pleadings and proof to support it.

■ (8) The judgment of the trial court seeking to enforce the contract as to Bradley's undivided interest in and to the tract of 143 acres is without pleadings to support it, in that Howell does not plead that in all events Bradley promised to convey to him a lease on his undivided interest, in the event the other joint owners failed or refused to carry out the contract.

Such judgment is contrary to the evidence in the case, in that the very contract on which Howell stands shows upon its face that he not only did not contract for Bradley's undivided interest, but same shows that he is not entitled to recover as to such undivided interest, in that the contract specifically provides that if the other joint owners do not consent to and execute and deliver the entire lease to Howell, the money advanced by Howell shall be applied to the purchase price of a different tract of land leased by Bradley and wife to Howell, and Howell was then to pay Bradley an additional $400 for such other tract of land.

■ We desire to say further that appellee's contention that the execution of the lease to the Kadanes effected an abandonment of the homestead is not sound. The execution of such lease was not inconsistent with but was entirely consistent with the homestead rights, claims and user. Evans et al. v. Mills et ux., 5 Cir., 67 F.2d 840.

■ Any contention that the proposed lease was placed in escrow with R. J. Bradley by the other joint owners is not supported by the evidence and is not sound.

An escrow deposit cannot be made with one of the parties to the instrument, or his agent. Tyler Bldg. & Loan Ass'n v.

Biard & Scales, 106 Tex. 554, 171 S.W. 1122, 1200; Green et al. v. Priddy, 112 Tex. 567, 250 S.W. 656; Smith v. Daniel et al., Tex.Civ.App., 288 S.W. 528.

On the question of the right to repudiate the instrument before it was actually delivered to Howell and the purchase price paid, see the following additional authorities: Burke-Mobray et al. v. Ellis et al., 44 Tex.Civ.App. 21, 97 S.W. 321; Burnett et ux. v. Continental State Bank, Tex.Civ. App., 191 S.W. 172; Schmidt et al. v. Baar, Tex.Civ.App., 283 S.W. 1115, writ dismissed; Jackson et ux. v. Scoggins, Tex.Civ. App., 220 S.W. 302.

The judgment awarding damages against R. J. Bradley, because of his failure to deliver the lease to Howell covering 343 acres, is contrary to the law and the facts, in that Howell knew that 200 acres of this tract constituted the homestead of R. J. Bradley and wife, and the wife not only could not be required to perform an executory contract for the lease or sale of her homestead, but had the absolute right to refuse to enter into the lease at any time before it was delivered to Howell, and, under such circumstances as are disclosed by this record, the court was without authority to penalize the husband, because of the wife's refusal to consummate the transaction. 22 Tex.Juris, pp. 114–116, sect. 79; Saulsbury v. Anderson, Tex.Civ.App., 39 S.W.2d 142, writ dismissed; Collett v. Harris, Tex.Civ.App., 229 S.W. 885, and cases cited; Finley et ux. v. Messer, Tex.Civ.App., 9 S.W.2d 756, and cases cited.

We believe that our conclusions, as disclosed by our original opinion, are sound.

The motion for a rehearing is overruled.